THE REVENUE.[1]

THE DREW.

NEW JERSEY STEAM-BOAT CO. *v.* COLLIER.

COLLIER *v.* NEW JERSEY STEAM-BOAT CO.

(*District Court, S. D. New York.* February 27, 1890.)

COLLISION BETWEEN STEAM AND SAIL—INATTENTION TO LIGHTS—SHORT SCREEN-BOARDS IMMATERIAL.

A collision occurred about 1 o'clock at night, in the Hudson river, a third to one-half a mile below Esopus light, and from 300 to 600 feet from the west bank of the river, between the steamer Drew, on one of her regular trips from Albany to New York, and the sloop Revenue, bound up the river. By reason of the collision the sloop was sunk, the Drew was injured, and cross-libels were filed to recover the damages. The channel at that point is 2,000 feet wide. The night was a little misty, but not enough to obscure lights. On the part of the Drew it was contended that the sloop was at first on the east side of the river, but that, as the Drew swung around Esopus light, the sailing vessel changed her course to the westward, thereby running into the Drew, which had shaped her course to pass to the west. It was also asserted that defects in the screen-boards of the sloop's lights contributed to the collision. The witnesses for the sloop claimed that she was always only two or three hundred feet from the west bank, and made no change of her course towards the west. *Held,* on conflicting testimony, that the accident was in the western third of the river; that the navigation of the sloop was proper; that she did not change her course; that inattention on the part of the Drew, and her unjustifiable attempt to cross the sloop's course to the west, caused the collision; and that if the screen-boards were short, that did not mislead the Drew, or contribute to the collision.

In Admiralty. Cross-actions for damages by collision.

*W. P. Prentice,* for The Drew.

*Hyland & Zabriskie,* for The Revenue.

BROWN, J. The above cross-libels were filed by the owners of the steamer Drew and the sloop Revenue to recover for their respective damages upon a collision between these vessels at a little before 1 A. M. on the 12th of April, 1889. The Drew was making her regular trip from Albany to New York. The sloop was bound up the North river. The collision occurred from a third to half a mile below Esopus light, and from three to six hundred feet off the west bank of the channel, which is there over 2,000 feet wide. The sloop's bowsprit struck the port bow of the Drew about 80 feet from her stem, and tore away some 50 feet of her side. The sloop was so injured that she sank shortly after. Her crew were picked up, at the Drew's request, by the steamer Amsonia, which came up the river a few minutes after the collision. The night was mild and a little misty, but not enough to obscure the lights. The wind was southerly, and very light, and the sloop was making only about two knots an hour. At Esopus light there is a gradual bend in the river, so that the Drew, in going a half mile around the light to the southward, makes a change in her course of about four points to starboard. After the change there is a straight reach in the river of from two to three miles. On the part of the Drew it is contended that the sloop was on the east side of the river before the Drew had rounded

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

Esopus light, but that while the Drew was swinging the sloop changed her course by several points, and crossed to the westward, and thereby ran into the Drew, which had shaped her course to pass to the westward of the sloop port to port. For the sloop it is claimed that she was all the time not more than two or three hundred feet from the west bank; that she made no change of course to the westward, but followed the line of the shore.

There are many difficulties in the testimony. The contradictions and inconsistencies are numerous. On the whole, I think the account given by the sloop's witnesses is sustained by the circumstances and the probabilities of the case. Without discussing the mass of details in evidence, I find that the sloop was not on the east side of the river, but in the west third of the channel-way, going up from three to six hundred feet only from the west bank, and that the collision was about the same distance from the west bank; that the Drew, in rounding Esopus light, passed considerably to the eastward of the sloop, thus crossing the line of the sloop's course from port to starboard, so as to bear upon the latter's starboard bow, while the latter was heading nearly in line with the shore; that the Drew, continuing her swing, again crossed the line of the sloop's course to the westward, towards the sloop's port bow, and thereby brought about the collision, the sloop striking the Drew before the Drew had crossed the sloop's course; that the sloop, during this time, made no sheer to the westward, as alleged by the Drew, and did not change her course to the westward; and that she made no other change than by a port wheel a few seconds before the collision *in extremis*, which had no material effect. The place of the collision and of the wreck, and the very slow speed of the sloop before the collision, confirm the testimony of the sloop's witnesses, that she was near the west bank. That the Drew, in making her swing, passed first considerably to the east of the sloop, and afterwards drew considerably to the westward before the collision, (overestimated, I think, at 700 or 800 feet,) is proved, not only by the testimony of the master and lookout of the sloop, but by the witnesses from the steamer Amsonia, which was a little below and considerably to the eastward of the sloop. Up to the time when the steamer began to draw up to the south-westward, the master of the sloop supposed the Drew would pass to the eastward, as there was plenty of room for her to do. Up to that time the Drew's green light had been constantly visible from the time she was first seen. Upon her turn to the south-west, when perhaps a thousand feet distant, she showed her two colored lights; and that was the first notice to the sloop that there was danger of a collision. In that situation, and going only about one-eighth as fast as the Drew, the sloop was helpless to avert it. That the sloop's course was in line, or nearly in line, with the shore, is proved not only by her own witnesses, but by the fact that she cut off Esopus light from the Amsonia below her, and especially by testimony of the Drew's witness Allardice, who, on hearing the Drew's whistle a few seconds before the collision, went to the window to look, and could see nothing; but a few moments afterwards he went to the midships gangway on the port side, and then saw the sloop's red and green lights about 200 feet distant.

Had there been more than a difference of two points in the courses of the sloop and the Drew at that time, he must have seen the sloop's lights from the side window; and, as the Drew was then heading somewhat across to the westward, the sloop's course must have been nearly in line with the river.

It was the duty of the Drew to keep out of the sloop's way. There were no obstacles to prevent her doing so. The Drew's theory of the navigation of the sloop, which is set up as her excuse, I regard as disproved. I cannot find any fault in the sloop's navigation. It follows that the Drew must be wholly charged with the loss, unless the alleged defects in the sloop's screen-boards produced or contributed to the collision. The original libel of the Drew contains no charge of fault in this respect; but the Drew's subsequent answer to the cross-libel charges that the sloop's screen-boards were two feet long instead of three, allowing the red light to show improperly across the starboard bow, and that the Drew was misled thereby. The only evidence on this point on the part of the Drew is that of the pilot, Gage, who says that the captain of the sloop, in conversation, afterwards told him his screen-board was "about two feet long, and the light in the middle of it." The captain, who was also owner, was afterwards examined as a witness at length. No inquiry was put to him touching this conversation, or his alleged statement, and it was not denied. The wheelsman testified that the lights were properly put up, and burning brightly. There is no further evidence as to the screens, or their adjustment. This is a very unsatisfactory state of the evidence. If improper screen-boards were proved, no doubt the burden of the proof would rest on the sloop to show that it was immaterial here, and in no way contributed to the collision. Capt. Collier's attention ought doubtless to have been called to his alleged prior statement. That this was not done may have been due to his deafness, so that he did not hear the testimony on that point. There is counter-testimony that the lights were properly put up, and it seems improbable that the sloop should have been navigated by Capt. Collier 15 years with improper screens. But if the screens were not as long as required by the regulations, it does not follow that the red light had an excessive range to starboard; and upon the evidence of the Drew's witnesses, I am satisfied that its precise range was not material in this case, or that, even if excessive, it contributed in any degree to the collision. The pilot, Gage, says repeatedly that he understood and supposed that the sloop was going right up the river, in a line with the shore, and not crossing to the westward, as he now contends that she was. I am obliged to reject his theory that she was crossing to the westward, and to find that she was going, as he says that he supposed she was going, directly up the river. The only way in which the exhibition of the red light too much to starboard could mislead the pilot of the Drew would be in inducing him to suppose that the sloop was crossing towards the east, or more to the eastward than she was going. But the pilot, Gage, was not misled into any such supposition. His management of the Drew was based, not on any idea that the sloop was drawing to the eastward, but on the assumption that she was going straight up, as I find she was going.

His only complaint of being misled is in her alleged going to the westward, which I find was not the fact. Moreover, the place of the Drew was so far over in the westward part of the channel way that she was necessarily on the Drew's starboard bow up to within half a minute or a minute of the collision. The Drew was then to the eastward of the sloop. The position of the sloop was plainly visible on the westward side of the channel, and no reason is shown why the Drew should again cross the sloop's course in order to go to the westward of her, and so near the west bank. Her natural course was down about the center of the river. The sloop was not crossing to the eastward, and the Drew did not suppose her to be crossing to the eastward; so that the red light, whether seen at that time or not, in no way misled the Drew into crossing the sloop's course by going over to the westward. The situation was practically the same as if the red light had been shut in, the green hid by the jib, and a flash light shown from the sloop's bow. I do not, however, place much reliance upon the Drew's testimony that the red light, and the red light only, was seen at the time of her first turn to the south-westward; for this testimony is associated with the further statement that the red light was seen on the Drew's port bow. But the red light could not have been brought on her port bow until after a considerable swing by the Drew to the westward, and her real fault was prior to that time, viz., in permitting her to swing at all to the westward of the sloop. Just before that swing the red light, if visible at all, was on the Drew's starboard bow, and not on her port bow. Again, they say they did not see the sloop's green light; but the green light was certainly in range, and could not all that time have been hidden by the jib. The unavoidable inference is that they were not carefully noticing the sloop or her lights.

A careful reading of the libel and the testimony shows that the time before the Drew began her swing to the westward, or "straightening down," as it is called in one or two places, *i. e.*, turning to the S. W. or S. S. W., is slurred over with no satisfactory explanation. It does appear, however, that the lookout was not on duty in his proper place forward, but in the wheel-house; and he was so suspiciously regarded by each side that, though he was present at the trial, neither called him as a witness. My conclusion is that due and continued attention had not been given to the sloop before the Drew's westward swing, and the pilot says he had not given her much attention; that it was probably the green light, and not the red light, that was then seen, and which seemed to "follow up" the Drew in her westward swing, a phrase possibly applicable to the green light, but not possibly applicable, so far as I can perceive, to the red light, in the respective positions of the two vessels; that the vessels were then so near each other that the particular lights seen were neither specially noted nor accurately remembered; and that the only red light visible on the Drew's port bow, just before her westward swing, was the red light of the Amsonia, a little below. As I cannot find, therefore, that there was any fault of the sloop that contributed to the collision, the libel of the New Jersey Steam-Boat Company must be dismissed, with costs; and a decree allowed for the libelant Collier, with costs.